321-0452 W.C. R.G. Construction Services, Inc. Appellant by Robert Newman v. The Illinois Workers' Compensation Commission, Daniel Geppner, Appellee by Matthew Walker. Thank you. Mr. Newman, you may proceed. Thank you, Your Honor. May it please the Honorable Justices of the Appellate Court, I'm Robert Newman for the Appellate R.G. Construction Services, Inc. Our case today is about the claim of Daniel Geppner for bilateral total knee replacements. Mr. Geppner was a 54-year-old laborer for R.G. Construction Services as of July 20, 2016. In the past history, Mr. Geppner had anterior cruciate ligament repairs in 1991 by Dr. Redondo. That's at page C-184 and 225 in the record. The relevance is that ACL repairs are a risk factor for a patient later needing total knee replacements. Both Dr. Chudik, the claimants' expert at C-537 to 538, and Dr. Troy Carlson, the respondents' or employers' expert at C-757 said the same thing about ACL repairs being a risk factor for later needing total knee replacements. Also, before the claimed accident on March 4, 2013, three years before the accident claimed in this matter, Mr. Geppner went to Dr. Chudik for a knee replacement. Dr. Chudik had a disability afflicting both knees. Mr. Geppner reported trouble with walking and with working at the time. That's C-226. The clinical examination by Dr. Redondo, again, this is three years before the occurrence, said that the clinical examination showed obvious deformities of the knees. X-rays taken that day by Dr. Redondo showed bone-on-bone arthritis, advanced degenerative changes, and retained hardware from the previous surgeries in both knees. Dr. Redondo, in his note of that day, anticipated that Mr. Geppner would need total knee replacements at some future time, but at age 51, he should defer the knee replacements if he could. That's in response exhibit 3, pages 721 to 723. Now, to the occurrence of July 20, 2016, Mr. Geppner was working at the University of Chicago Medical Building in Orland Park, which was then under construction. He and Tom Broke were stacking lead board in a room that would be outfitted for X-ray room use. They were taking the lead board from a drywall cart and putting it in a stack on the floor. As they were putting the next to the last sheet down, Tom Broke noticed that the last board was falling toward Geppner, so he hollered out a warning. Mr. Geppner said he made a quick move to his left, but the lead board still hit his back and slammed him down on his knees. This is at C193 to 194. Mr. Geppner said he felt a pop in his right knee at that time. Again, C193 to 194. At the time, Mr. Geppner told Broke that he hurt his right knee. That's at C167. Again, that day of occurrence, Mr. Geppner signed a report, which is Respondents 12, in which he reported that he'd injured his right knee. That's at C946. Mr. Broke, with permission of the foreman, took Mr. Geppner to Palos Community Urgent Care. At the Urgent Care Center, Dr. Richard Wilson documented injury to one knee only, being the right knee. That's at C259, Petitioner Exhibit 2, page 9, also Respondents 4. Dr. Wilson noted that minor valgus stress on the right knee increased the pain and that Geppner could not fracture, no dislocation. It did show, of course, the degenerative arthritis that was present in 2013, also still present in 2016. Mr. Newman, I mean, it's essentially undisputed that the claimant suffered from a pre-existing arthritic condition in both knees, correct? Yes, he did. No question about that. Isn't it compensatory? I think the argument is that the work accident aggravated that pre-existing condition, correct? Well, that's the argument, but Dr. Chudik, claimant's expert, testified that the claimant must have had a twisting injury to the left knee. Chudik said a twisting injury, not a direct striking injury, would be necessary to aggravate the degenerative arthritis. That's in the record C548 and C558. But there was no evidence of a twisting injury to the left knee. What did Dr. Redondo say, Mr. Newman? What did Dr. Redondo say? He also testified for the claimant, right? No, he didn't testify, sir. Dr. Redondo didn't testify. Some of his records were admitted into evidence, but he didn't testify. He didn't testify. What did his records say on behalf of the claimant? Did it support the claimant's position? In part, but in part it didn't, because on July 28th, 2016, which is when he saw him right after the occurrence, or first after the occurrence, and several dates after that, Dr. Redondo wrote in his records that the claimant had primary unilateral osteoarthritis of the right knee and the left knee. And primary osteoarthritis, by definition, is not secondary to any other event. If it was secondary to an event like an accident or trauma, it would have been osteoarthritis secondary to whatever event it was. So for months and months after the occurrence, Dr. Redondo, in his records, wrote this as primary unilateral osteoarthritis, specifically at C285 and 286. So Redondo's records at first indicated it was the primary osteoarthritis, not secondary to any occurrence. Later on, he made some conclusionary remarks in some of his records that there was a cause of connection, but he never detailed what the accident had been, never detailed the mechanics of the accident, never had an explanation for how he thought the aggravated the primary osteoarthritis of the left knee. And Dr. Chudik is who, again? Dr. Chudik is an examiner selected by the claimant. Didn't he agree with Redondo's opinion that after the July 20, 2016 work accident, it permanently aggravated claimant's pre-existing knee condition? Well, he said that, but also on cross-examination, he said that in order for that to have happened, the claimant must have twisted his left knee in this occurrence. And the claimant never said he twisted the left knee in this occurrence. Dr. Chudik said he imagined that both of Mr. Gepner's feet were on the floor when the leadboard struck him on the right side and the back, but Gepner said he was moving to his left at the time. He was moving to his left. So, obviously, to move to his left, he had to pick up his left foot. So, the testimony of Chudik is based on what he imagines happened, not what the testimony shows happened, and not what the contemporaneous records show what happened. That's why on behalf of RG Construction Services, we're arguing that the decision and opinion of the arbitrator and the commission relied impermissibly on speculation and conjecture by Dr. Chudik. Now, they said that they did rely on Chudik at page 21 of the arbitrator's record, 124. But the error of law is that Dr. Chudik relied on speculation and conjecture, not on the facts of the case as shown. In essence, you're saying that his testimony was based on a flawed foundation. So, you're saying so many words? Yes, sir. Yes, sir. That's right. And that's why it was an error for the commission to rely on it. And I'm citing First Compensation Commission, 367 Illinois Appellate 3rd 102, and Soto v. Guy Tan 313 Illinois Appellate 3rd 137 for the points that it's impermissible for the commission to rely on speculation and conjecture, even by a medical expert. If the expert speculates or conjectures like Chudik did in this case, just testifies based on what he imagined happened, not based on what the claimant said happened at the time. His testimony is flawed, like you said, and it's an error of law for the commission on the arbitrator to have relied on this speculative evidence by Dr. Chudik. We're asking the court instead to rely on Dr. Troy Carlson, who testified there was no fracture, no dislocation, no change of alignment in the left knee attributable to the occurrence. So, therefore, this occurrence would neither cause nor contribute to the need for left knee surgery. Hey, can I ask a question? Did the claimant testify that after this injury to his right knee, because he was favoring his right knee, he then began to experience pain in his left knee? Well, what he said was when the right knee began to cool down, he noticed pain in his left knee. He didn't really attribute it to walking mechanics or anything like that, which actually didn't make sense according to our changed, and that would cause his left knee to hurt really didn't make any sense. According to Dr. Carlson, and yeah, the petitioner didn't say that necessarily when he was walking, he aggravated his left knee after the occurrence. He just said that the pain developed in his left knee days after the occurrence. Well, of course, he'd been saying his left knee hurt him and was disabled three years before on March 4, 2013. So, that really wasn't a change in his condition, wasn't anything new. Well, other than the fact that prior to this event, he was able to work, and after this event, he wasn't. Well, that's conclusory on his part. Our experts thought he could, you know. Do his experts think he couldn't? Well, Dr. Chudik thought he couldn't, but you know, Redondo in many of his reports didn't say anything. Particularly on September 11, 2017, he had no findings on the right knee. So, Chudik's, Redondo's records in large part contradict each other on what he thought that the claimant could do. Our experts felt that the occurrence caused a contusion and strain of the right knee, and to the extent there was a contusion and strain, it was resolved by October 28, 2016. That's C-869, response exhibit 8, page 20, and also in Dr. Carlson's note, Dr. Carlson's report and deposition. So, with respect to the left knee, our point is that the claimant at the time didn't say he hurt his left knee. He didn't make a complaint. He wasn't examined for his left knee. He did need the left knee replacement years before, and he still needed it. When he underwent the knee replacement on his left knee prior to the arbitration hearing, he needed that because of his primary osteoarthritis and because of his prior ACL repair with the retained hardware. He didn't need it because of the occurrence of July 20, 2016. So, we're asking the honorable court to vacate the award of $101,693 for the medical costs attributable to the total knee replacement on the left knee. With respect to the right knee, again, Dr. Chudik and Dr. Carlson both said that a direct blow on the kneecap area would not aggravate the arthritis between the femur and tibia, and that's in Chudik's deposition C-548 and C-558, also in Carlson's deposition C-750 to C-751. There was no fracture, dislocation, or misalignment of the right knee caused by this occurrence, as explained by Dr. Carlson at C-750 to C-751. Mr. Geppner had a strain and contusion of the right knee, and it was not a factor in his right knee replacement, according to Dr. Carlson's testimony at C-750 to C-751. So, we're asking that the prospective award for surgical care of the right knee should be vacated by this honorable court. To recap the relief we're seeking for RG construction, vacating the $101,839 medical costs awarded and awarding no medical costs incurred since October 28th of 2016. RG had paid the medical cost to that date, which is explained. Mr. Newman, your time is up, but you'll have time in reply. Yes, sir. Thank you. Mr. Walker, you may respond. May it please this honorable court, as well as my friend and colleague, Mr. Newman. My name is Matt Walker, and I represent the claimant, Applee Daniel Geppner. Despite employers' assertions in their brief, the standard of review that applies to this claim is the manifesto-weight standard. The court instructed us in Schroeder that where the conflict bears heavily on which expert's opinion should be accepted, it cannot be said that the facts are undisputed, and therefore, the manifest weight standard is the appropriate one. The court said the same thing in Caterpillar Tractor in 1982. Writing that to the extent that the medical testimony might be construed as conflicting, it is well established that resolution of such conflicts fall within the province of the mission, and its findings will not be reversed unless contrary to the manifest weight of the evidence. So far, everything you said is essentially correct, but Mr. Newman, to focus in on what he was saying, is he's discounting Chudik. I think essentially saying that his testimony was based on a misinterpretation, misunderstanding of how the accident occurred and the mechanism of injury because the claimant's testimony wasn't consistent with other evidence. How do you respond to that? Well, your honor, you're correct. The employer is alleging speculation as to the twisting of petitioner's knees when he attempted to move out of the way of the falling lead board, but Dr. Chudik opined to a reasonable degree of medical and surgical certainty based upon his training experience that the petitioner's sudden shifting of his weight to the left in order to avoid being struck by that falling lead board did suggest a twisting injury to both knees. And Dr. Chudik testified as follows, claimant knows he was shifting his body when he did it to a lateral movement, which I know from my mechanics that requires rotational twisting at the knee. So the mechanism does suggest a twisting injury that is described in the ER report of July 20th of 2016, and that's from Dr. Chudik's evidence deposition on page number 68. So his your honor. And in fact, um, employers council agreed during the deposition of Dr. Fletcher, who served as employers examining physician, the first examining physician on page 29 lines five through 17, that the accident involved a twisting injury. And that occurred during an exchange between Mr. Mr. Makarowski and Mr. Alexi during the deposition at line five, Mr. Makarowski stated just in response to relevancy, we are dealing with a specific injury and occurrence, not a repetitive trauma injury. Mr. Alexi, we are talking about a preexisting condition, which this doctor on direct examination has said that a blow to both knees after a 200 pound lead board hit him would not be of any relationship to his ensuing symptoms. And Mr. Makarowski responded just in response, he gave that opinion based on the diagnostic studies and the fact that the initial history that your client gave and signed a document on didn't indicate an injury to both knees, it indicated a twisting injury. And Mr. Alexi's response was save it for oral argument, which is where we are today. So I would proffer that it is a reasonable inference from the medical records as to a twisting injury as evidenced by a medical expert, Dr. Chudik coming to that conclusion, as well as a lay person and Mr. Mr. Makarowski coming to the same conclusion based on the evidence. Let me clarify one thing with regard to I think Mr. Newman stated that he was unaware of claimant making the assertion that his left knee, he began feeling pain in his left knee shortly after the accident, and that he attributed it to a favoring it because of the injury to the right knee. I believe Mr. Newman said he didn't recall claimant making that that statement. Did he or did he not attribute his left knee pain to changing his gait or favoring it after the work accident? Your Honor, the record shows that the claimant after the injury, claimant testified that two days, approximately two days after the July 20th, 2016 work accident, his right knee pain began to cool off a bit is the term he used. And he noticed that the left knee was also painful. So in that two days, there was no two days. He was essentially at home resting as the pain lower lessened a bit after the traumatic injury on the right knee. He noted the pain in the left knee, which was recorded by Dr. Redondo in the July 28th chart note, which was a mere eight days after the accident, that there was an injury to his bilateral knees. So he, to your knowledge, he never testified as to whether or not he attributed any of that pain after the cooling off of the right knee pain. That was because he was favoring his left knee. No, Your Honor. Right. I would, I would say from the record and from the evidence that both knees were injured on July 20th of 2016. The symptoms became more prevalent and recognizable to the claimant on a couple of days after that, and they were recorded on the eight days by the eight days afterwards by the orthopedic surgeon. And therefore there was no need or any, no indication from any of the doctors that an altered gait was the reason for the left knee pain and the claimant never testified to that either. Okay. Thank you. Okay. Dr. Chudik. Oops, I'm sorry. Let me get my spot here. The commission decided that the fact that the first complaint of left knee pain does not appear in the record until eight days post accident is not so remote as to negate a finding of causal connection. And that finding is enough to confirm the decision that the July 20th, 2016 work accident permanently aggravated the underlying arthritic condition in claimant's bilateral knees. When viewed through the lens of the commission's chain of event analysis, the facts of the case fit well into a chain of events, causation analysis, and is yet another reason for this honorable court to confirm the commission's majority decision in its entirety. There is no doubt that the claimant suffered with the preexisting arthritic condition in his bilateral knees. And this is a condition, mind you, that Dr. Redondo attributes in part to claimant's work as a union laborer, and that Dr. Chudik testified could have been caused in part by claimant's job duties as a union laborer. Claimant testified to his job duties at the hearing, and Dr. Chudik, the expert, was also privy to those job duties, which the claimant confirmed at the time of hearing were accurate. So claimant's condition, if we look at claimant's condition and how it affected him prior to the July 20th, 2016 work accident, claimant performed his job duties as a union laborer without any restrictions until the accident on July 20th of 2016. The claimant testified as to the labor-intensive jobs that he was performing leading up to the July 20th, 2016 accident. Claimant testified that any bilateral knee pain pre-accident did not cause him to lose any time from work prior to the work accident on July 20th of 2016. All of this testimony was unrebutted. We can juxtapose claimant's condition pre-accident with the significant deterioration of his condition post-accident that abruptly rendered claimant unable to work. After the July 20th, 2016 work accident, claimant was unable to return to his job as a union laborer through the date of the hearing. At the date of the hearing, as Mr. Newman stated, he had already undergone a left knee replacement and at the time of the hearing was still off of work waiting to undergo the right knee replacement. His condition did not return to baseline at the time of the hearing. Prior to the date of the hearing, Dr. Carlson, respondent's expert himself, wrote that the claimant would require restrictions due to the in his April 30th, 2019 report. From Dr. Carlson's report, question three. After examining the petitioner, can you give us your opinion on what, if any, work restrictions the petitioner may need for either knee? Dr. Carlson's answer. For someone who has had a knee replacement, the amount of kneeling, squatting, or crawling would have to be minimal, if any. In terms of the right knee, his restriction would be based on symptoms. There is no medical reason he could not be at full work for his right knee, but if he is having pain symptoms, he will have to be at a sedentary job until after the knee replacement. The other issues raised by the employer as to TTD, medical bills, and prospective medical will all stand or fall on whether the July 20th, 2016 work accident resulted in a permanent aggravation of claimant's underlying arthritic condition. The treatment that was rendered was reasonable. That was the opinion of each and every doctor involved in the matter. The only medical dispute was causation and whether claimant's pre-existing arthritic conditions in his bilateral knees were permanently aggravated as a result of the July 20th, 2016 work accident. The commission decided that the work accident did permanently aggravate the pre-existing arthritis, giving rise to the need for bilateral knee replacements. We contend that the commission's decision was the correct one. Employer did question and talked about the award of medical bills and in their brief stated that the employer should only be held responsible up to the amounts negotiated between the physicians and the group carriers for bills that were paid by the claimant's group insurance. But the commission's award allowed for such adjustments by stating that any payments should be made pursuant to sections 8a and 8.2 of the act, which would satisfy that particular issue for the employer. The July 20th, 2016 work accident resulted in an abrupt deterioration of the claimant's ability to work. The commission found the July 20th, 2016 work accident permanently aggravated the claimant's bilateral knee arthritis resulting in the need for bilateral knee replacements. The commission is right and today claimant would respectfully pray that this honorable court confirm the Illinois Workers Compensation Commission's majority decision in its entirety. Excuse me. Any questions from the court? Hearing none. Thank you, Mr. Walker. Mr. Newman, you may reply. Yes, sir. Thank you. Yes, we are seeking the medical cost of $101,839.64 be vacated and no medical costs be awarded since October 28, 2016, which the respondent employer had paid according to Respondent Exhibit 2, which is C-718. We're also asking the court to vacate the prospective award for right knee replacement and to modify the TTD award to July 20th, 2016 to October 28, 2016, 14 and two sevenths weeks because our expert Dr. Fletcher found Mr. Gepner's, to the extent that he was injured on July 20th, his injury had recovered and gone back to the baseline as of October 28, 2016, as I cited before, that's C-869. We're saying that this commission decision is error as a matter of law because of the reliance on Dr. Chudik. Chudik imagined the twisting injury of the left knee and there wasn't any contemporaneous proof of that. Respondents Exhibit 12, looking at C-946, doesn't say that there was a twisting injury to any knee. The passage cited by Mr. Walker at C-878 where Mr. Makarovsky and Mr. Alexey had that colloquy. Well, what Mr. Makarovsky was saying was interrupted by Mr. Alexey. We don't know where he's going with this comment or question. It was just interrupted in the middle. I don't think you can make any judgment based on that. The case was not tried as a repetitive trauma case. Dr. Carlson, though, did say in his deposition that there are laborers who have degenerative arthritis of the knees, but there are accountants who do. And there are laborers who work to age 70 and don't have degenerative arthritis of the knees. It doesn't really go according to occupation that way. That idea certainly was not the way the case was tried. It was tried as a specific trauma, not repetitive trauma. Dr. Chudik and Dr. Redondo did not say that there was repetitive trauma. They did not prove that point at all. And with all respect, I'm asking the court to vacate and reverse the decision and opinion of the Workers' Compensation Commission and the Circuit Court of Will County in the matter. Thank you. Thank you, Mr. Newman. Thank you, Mr. Walker, both for your arguments in this matter. It will be taken under advisement. A written disposition shall issue.